FILED

02 DEC 12 PM 4:56

U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| DEBORAH ADAY, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Civil Action No. CV-01-S-1489-NW |
| | ) |
| COLBERT COUNTY EMERGENCY | ) |
| MANAGEMENT COMMUNICATIONS | ) |
| DISTRICT, | ) |
| | ) |
| **Defendant.** | ) |

ENTERED

DEC 12 2002

## MEMORANDUM OPINION

Plaintiff, Deborah Aday, an African American female, alleges that her former employer, the Colbert County Emergency Management Communications District, subjected her to retaliation,[1] culminating in the termination of her employment, in response to her complaints about racial harassment and discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* The case presently is before the court on defendant's motion for summary judgment, and, motion to strike portions of the affidavit submitted by plaintiff in opposition to the

---

[1] The complaint states that "plaintiff was subjected to unequal treatment by the defendant in retaliation for opposing unlawful employment practices. *The plaintiff was required to work in a hostile environment.*" Complaint ¶ 7 (emphasis supplied). The court finds that this oblique reference to a "hostile environment" does not set forth a claim for a racially hostile work environment but, rather, is used to describe the "retaliation" that plaintiff suffered. The Federal Rules of Civil Procedure require that a complaint contain only a "'short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). Even so, pleadings must be "something more than an ingenious academic exercise in the conceivable." *Marsh v. Butler County*, 268 F.3d 1014, 1037 (11th Cir. 2001) (en banc). Although notice pleading may not require that the pleader allege a "specific fact" to cover every element, or allege "with precision" each element of a claim, the Eleventh Circuit has explained that the complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Roe v. Aware Woman Center for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001), *cert. denied*, 122 S. Ct. 1067 (2002). Plaintiff's complaint does not satisfy those requirements. Instead, both the complaint and preceding EEOC charge clearly state that plaintiff asserts only a retaliation claim. *See* Complaint ¶¶ 2, 6, 7, 9, 10; *see also* defendant's evidentiary submissions, Exhibit 22 (Aday EEOC charge), Exhibit B (Aday deposition # 2). (*Nota bene* that *two* depositions of Deborah Aday are in the record. The first was Aday's deposition taken in connection with the lawsuit filed by Janice Rutland described in text *infra*. *Id.*, Exhibit A ["Aday deposition # 1"]. The second is Aday's deposition taken in the course of the present action. *Id.*, Exhibit B ["Aday deposition # 2"].)

33

motion for summary judgment.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendant's motion for summary judgment should be granted in part and denied in part. The court declines to rule on defendant's motion to strike, as that motion simply points out perceived disparities between plaintiff's deposition testimony and her later-submitted affidavit. The disparities

pointed out by defendant need not be resolved in order to adjudicate this action and, accordingly, such motion is moot.

## I. SUMMARY OF FACTS

### A.    Background

Defendant provides emergency operator and "911" dispatch services for the residents of Colbert County, Alabama. It is "a small organization," employing between eight to ten full-time employees and six to eight part-time employees.[2] The organizational entity is governed by a Board of Directors, composed of volunteers, who usually meet once a month.[3] The day-to-day operations of the organization are supervised by a Director, who is selected by the Board.[4] Defendant's employees principally are dispatchers, responsible for receiving emergency calls and dispatching police, fire, rescue squad, or ambulance services. The dispatchers are allocated among four shifts, with two dispatchers working on each shift. Each day is divided into two twelve-hour shifts. Dispatchers work a seven-days-on, seven-days-off, rotational schedule.[5] Plaintiff began her employment with defendant during December of 1998, as a part-time night dispatcher, but she later moved to the day shift and assumed a full-time position. While assigned to the day shift, plaintiff

---

[2] Defendant's evidentiary submissions, Tab D (Melton affidavit), at 1. These facts raise a "red flag" as to whether defendant is subject to suit under Title VII of the 1964 Civil Rights Act. "The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. . . ." 42 U.S.C. § 2000e(b). "Title VII jurisdiction does not lie over a case in which the fifteen-employee minimum is not satisfied." 1 A. Larson and L. Larson, *Employment Discrimination*, § 5.02[1], p. 5-8 (2002).

The court also notes that the parties' repeated, nonspecific citations to multiple-page affidavits and evidentiary submissions caused the court to exert an unnecessary amount of time sifting through documents to ascertain the relevant, undisputed facts. Defendant did not even bother to number the pages of many of its evidentiary submissions, causing this court to hand-number them. Generalized citations, such as "Plaintiff's Evidentiary Submissions # 1," or "Melton Affidavit," are not particularly helpful when that citation is to a multi-page document, because the reader must then search the entire document to find the cited fact.

[3] Defendant's evidentiary submissions, Exhibit C (King affidavit), at 1.

[4] Defendant's brief in support of summary judgment, at 2.

[5] Defendant's evidentiary submissions, Exhibit D (Melton affidavit), at 1.

was supervised by Janice Rutland. Ms. Rutland, like plaintiff, is an African American female.[6] In August of 1999, Michael Melton was appointed interim Director of the Colbert County Emergency Management Communications District. Melton was selected by the Board to permanently fill that position on April 27, 2000,[7] but he did not take over as permanent Director until June of 2000, apparently because his appointment also required the concurrence of the County Commission.[8]

**B.    Deficiencies in Plaintiff's Job Performance Documented Prior to *Any* EEOC Charge**

Defendant describes plaintiff as a "contentious and disruptive employee."[9] In support of that characterization, defendant catalogs the following events, all of which occurred prior to the filing of an EEOC charge of discrimination by either plaintiff or her supervisor, Janice Rutland:

| | |
|---|---|
| December 6, 1999: | Director Melton discussed with plaintiff's shift supervisor (Janice Rutland) his perception that plaintiff was "writing up to [sic] many incidents and that she had written up more things that [sic] anyone and alot [sic] of the issues were petty. [Melton] was not going to act on each one of them."[10] |
| January 21, 2000: | Michael Smith[11] of the Cherokee Rescue Squad wrote a letter complaining about the unprofessional and discourteous way that plaintiff had handled a call. Smith explained that plaintiff had refused to activate a pager, and that such a refusal was a "BREACH OF DUTY."[12] |
| March 1, 2000: | Melton and Janice Rutland discussed the fact that plaintiff had complained about Melton to defendant's Board.[13] Janice Rutland |

---

[6] Further, as discussed *infra*, Ms. Rutland filed an EEOC charge of discrimination in May of 2000, and instituted suit in this court on November 3, 2000 — both events preceding the present plaintiff's charge and suit.

[7] Defendant's evidentiary submissions, Exhibit O (Janice Rutland EEOC Charge).

[8] *Id.*, Exhibit D (Melton affidavit), at 1; Exhibit N (King letter).

[9] Defendant's brief in support of summary judgment, at 1.

[10] Defendant's evidentiary submissions, Exhibit J (Janice Rutland notes), at entry dated Dec. 6, 1999.

[11] There also is a "Michael Smith" that works for defendant as a dispatcher. The court assumes that these individuals are the same person, although the record does not clearly state such. *See* defendant's evidentiary submissions, Exhibit JJ (Smith Dec. 22, 2002 statement).

[12] *Id.*, Exhibit K (Smith Jan. 21, 2000 letter) (capitalization in original).

[13] *Id.*, Exhibit J (Janice Rutland notes), at entry for March 1, 2000.

|  | recorded in her notebook that "there seemed to be some personal issues between [Melton] and Deborah and that I felt they needed to sit down and discuss them. He said that she is the one that got mad and <u>took him before</u> the board and they [sic] everywhere he goes he hears something about her."[14] |
|---|---|
| March 10, 2000: | Rena Bolton[15] of the Cherokee Rescue Squad wrote a letter to Melton, complaining about the manner in which plaintiff had treated her. The letter added that Bolton perceived plaintiff's attitude to be "very smart and unprofessional."[16] |
| March 24, 2000: | Shift supervisor Patti McAnally reported a complaint by dispatcher Wesley Beard that, while plaintiff and Janice Rutland were listening to tapes of other dispatchers, "their mood was one of laughter and criticism."[17] |
| March 27, 2000: | Plaintiff told Janice Rutland that "she was tired of all the BS down there and that she was going to start to play hardball."[18] |
| April of 2000: | Dispatcher Wesley Beard again reported plaintiff, this time complaining that she was barging in on calls that he was handling.[19] |
| April 5, 2000: | Plaintiff reported to Janice Rutland that she had argued with Melton about her dealings with the Cherokee Rescue Squad.[20] |
| April 21, 2000: | An unidentified person representing the Cherokee Rescue Squad lodged a complaint about the manner in which plaintiff and co-employee Pam Rikard dispatched a call.[21] |

## C.   Janice Rutland's EEOC Charge

In April of 2000, Janice Rutland (plaintiff's shift supervisor) held the position of Assistant

---

[14] *Id.* (emphasis in original)

[15] The court notes that Bolton is Melton's cousin.  Plaintiff's evidentiary submissions, Tab 2 (Melton deposition), at 172-73.

[16] Defendant's evidentiary submissions, Exhibit M (Bolton March 10, 2000 letter), at 1.

[17] *Id.*, Exhibit L (McAnally statement), at 1.

[18] *Id.*, Exhibit J (Janice Rutland notes), at entry for March 27, 2000.

[19] *Id.* at entry for April 5, 2000.

[20] *Id.*

[21] *Id.*, Exhibit M (Cherokee Rescue Apr. 21, 2000 Incident Report).

Director of the Colbert County Emergency Management Communications District. The Director's position then was vacant, and Rutland applied. She was not selected. Instead, the board chose Michael Melton, then serving as interim Director. Melton is a Caucasian male. Rutland filed a charge of discrimination with the Equal Employment Opportunity Commission on May 15, 2000, alleging that she was not promoted because of her race and sex.[22]

## D. Complaints Lodged Against Plaintiff Between May and October of 2000

Plaintiff asserts that she and Janice Rutland were treated differently following Janice Rutland's EEOC charge, stating that "[a]fter the filing of Ms. Rutland's charge, the two of us began to be . . . ignored by other employees and supervisors. We also had petty complaints made against us by other employees."[23] She points to the following events in support of the latter assertion:

| | |
|---|---|
| May 17, 2000: | An unidentified person representing the Cherokee Rescue Squad complained that plaintiff failed to dispatch the Cherokee Fire Department to a motor vehicle accident.[24] |
| August 18, 2000: | The Chief of the Tuscumbia Fire Department wrote a letter to Melton, stating that "WE HAVE MADE SEVERAL COMPLAINTS ABOUT THE WAY JANICE RUTLAND AND DEBORAH ADAY HAVE BEEN DISPATCHING US OUT ON EMERGENCY CALLS."[25] |
| September 7, 2000: | Investigator Doug Hargett of the Colbert County Sheriff's Department complained that he could not raise the 911 dispatchers on the radio during plaintiff's shift.[26] |
| October 2, 2000: | Four emergency medical technicians sent a letter to Melton, complaining that plaintiff was dispatching them in a manner that could expose them to danger (*i.e.*, dispatching an ambulance to a domestic disturbance before the scene had been secured by police). |

---

[22] Defendant's evidentiary submissions, Exhibit O (Janice Rutland EEOC Charge).

[23] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 2.

[24] Defendant's evidentiary submissions, Exhibit P (Cherokee Rescue May 17, 2000 Incident Report).

[25] *Id.*, Exhibit Q (Tuscumbia Fire Department Aug. 18, 2000 letter) (all cap emphasis in original).

[26] *Id.*, Exhibit R (Colbert County Sheriff's Department Sept. 7, 2000 Complaint Report).

> The complaining technicians were Jennifer Rutland, Sherry Mabe, Vickie McGee, and Shelia Hayes.[27]

(Parenthetically, the court observes that, with the sole exception of *Jennifer* Rutland, who worked part-time for defendant,[28] the other persons identified above, who lodged complaints about the manner in which plaintiff performed her duties, were *not employed* by defendant. Consequently, to the extent that plaintiff relies upon such expressions of dissatisfaction as evidence that "petty complaints" were levied against her and Janice Rutland "by other employees" in retaliation for protected activity, her assertion lacks both factual or legal support. As a matter of law, there must be a causal linkage between protected activity and the alleged "adverse" employment action inflicted in retaliation therefor, *see, e.g., Bailey v. USX Corp.*, 850 F.2d 1506, 1508 (11th Cir. 1988), and it strains logic to understand how complaints of non-employees could be causally connected to defendant. *Cf. Brungart v. BellSouth Telecommunications, Inc.* 231 F.3d 791, 798-99 (11th Cir. 2000) ("That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him.").)

## E.    Plaintiff's Letters to Melton

Plaintiff wrote a brief letter to Melton on September 10, 2000, stating that "[t]his is to inform you that I feel I'm being singled out and it's creating a hostile working environment for me. I feel it is directly linked to me working with Mrs. Rutland."[29] Melton responded by means of a letter dated September 22, 2000, stating that he wanted to discuss not only plaintiff's concerns, but also

---

[27] *Id.*, Exhibit S (Keller Ambulance October 2, 2000 letter).

[28] Jennifer Rutland was employed by the Cherokee Rescue Squad, but also worked part-time for defendant. Jennifer Rutland also is a cousin of Michael Melton, and she is not related to *Janice* Rutland.  Plaintiff's evidentiary submissions, Tab 2 (Melton deposition), at 172.

[29] Defendant's evidentiary submissions, Exhibit T (Aday Sept. 10, 2000 letter).

a complaint received from an outside agency regarding plaintiff's handling of a "911" call.[30] Melton

proposed that the meeting be held in his office on September 29, 2000.[31]    Plaintiff sent Melton a

written response on September 28, 2000, stating:

> I am in receipt of your letter on September 22, 2000, advising me that you wish to
> meet regarding my letter on September 10, 2000.
>
> As I am certain you know[,] I support Janice Rutland in her claim, that she was
> denied the position of Colbert County E9-1-1 [sic] Director because of her race and
> sex in deprivation of rights secure [sic] to her under Federal Law.
>
> Although I am willing to meet with you without conditions, I am requesting that I be
> permitted to have a witness present at this meeting.  I take this position because I
> have repeatedly observed incidents where you seem to become enraged and out of
> control, to the extend [sic] I am genuinely afraid to meet with you alone.
> Accordingly, I am requesting I be permitted to have Ms. Rutland present between us,
> and I further request this meeting be scheduled next week.[32]

Plaintiff and Melton never met, however.  The meeting did not occur because plaintiff "was

concerned about Mr. Melton's temper and the out-of-control behavior which [she] had seen him

exhibit on various occasions."[33]

**F.    Plaintiff's Meeting with the Board on October 5, 2000**

While plaintiff and Melton never met regarding the complaint lodged in her September 10,

2000 letter, she did attend a regular Board meeting the following month, on October 5, 2000, and

complained about Melton's temper.[34] During that meeting, plaintiff learned of the October 2nd letter

from four emergency medical technicians, complaining that her dispatch technique was dangerous.[35]

Plaintiff "presented to the Board [her] grievance and complaint and identified three witnesses to an

---

[30] *Id.*, Exhibit U (Melton Sept. 22, 2000 letter).

[31] *Id.*

[32] *Id.*, Exhibit V (Aday Sept. 28, 2000 letter).

[33] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 2.

[34] *Id.*; defendant's evidentiary submissions, Exhibit C (King affidavit), at 1.

[35] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 2.

incident where [plaintiff alleges that] Melton lost his temper in [her] presence."[36]  Following this meeting, the Board sent plaintiff a letter dated October 11, 2000, asking her to provide more specific examples of Melton's temper tantrums, along with witnesses to, and dates of, the incidents.[37] Plaintiff responded with a letter dated November 2, 2000, asserting that Melton lost his temper on June 14, August 7, and September 7, 2000.[38]  Plaintiff also stated that there were two witnesses to the June 14th incident, Mike Cope and Pam Rikard.[39]

The Board investigated all incidents identified by plaintiff.[40]  A statement was obtained from one of plaintiff's witnesses, Pam Rikard, who did not support plaintiff's allegation; she declared that "[s]ince I have been employed with E-911, I have not witnessed Mr. Melton lose his temper. . . ."[41] Plaintiff's other witness, Mike Cope, was not employed by defendant, and apparently was not interviewed.  In any event, the Board found no evidence to substantiate plaintiff's claims.[42]  The court also notes that, during deposition, plaintiff admitted that she did not actually observe Melton lose his temper on September 7, 2000.[43]

## G.    Purported Retaliation Against Plaintiff in Response to Her Letters to Melton

Plaintiff asserts that her work environment deteriorated after she complained to Melton in September of 2000.[44]  Plaintiff's declaration states that:

After my letters complaining about the hostile treatment and voicing my support for

---

[36] Defendant's evidentiary submissions, Exhibit W (King October 11, 2000 letter).

[37] *Id.*

[38] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 3.

[39] *Id.*

[40] Defendant's evidentiary submissions, Exhibit C (King affidavit), at 1.

[41] *Id.*, Exhibit X (employee statements), at Rikard statement.

[42] *Id.*, Exhibit C (King affidavit), at 1.

[43] *Id.*, Exhibit B (Aday deposition # 2), at 164.

[44] Plaintiff's brief opposing summary judgment, at 6.

Ms. Rutland, every time Ms. Rutland was written up, so was I. The write-ups became more frequent. Every time Ms. Rutland or myself would ask questions, Mr. Melton would not answer them. If we asked Mr. Melton to show us the proper way to perform a procedure, he would ball up his fists, storm out of the room and slam the door without assisting us. Ms. Rutland and I were left out of the dissemination of information and meetings would be held on days when we were off. Other employees were called on their off days to come to meetings, whereas, we were not.

Ms. Rutland and I were also treated differently by other co-employees after my letters dated September 10th and 22nd. The co-employees would constantly make baseless and petty complaints about us. In addition, employees of outside agencies, many of whom were related to Mr. Melton, would make petty and unfounded complaints against us. I had not been treated in this manner prior to Ms. Rutland's charge of discrimination and my letters stating my support for Ms. Rutland.[45]

Plaintiff also alleges that, when she committed a workplace infraction, she was punished more harshly than other employees and, further, that complaints she filed against co-employees were not investigated.[46]

## H.   Complaints Filed By and Against Plaintiff Between November of 2000 and February of 2001

A flurry of complaints by and against plaintiff and Janice Rutland were filed during the last two months of 2000 and the first two months of the following calendar year. Plaintiff's declaration correctly characterizes many of the allegations leveled against her as "baseless and petty."[47] (Judging from the evidentiary submissions, however, plaintiff was *in pari delicto* with her co-employees on the "pettiness" scale.) The following is a synopsis of events.

October 31, 2000:   Plaintiff filed an incident report, complaining that co-worker Matt Moore was "real rude" to her when she told him to "stand by" while she elicited more information from a caller.[48]

November 3, 2000:   Janice Rutland filed suit against defendant, alleging race and sex

---

[45] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 3.

[46] *Id.* at 3-4.

[47] *Id.* at 3.

[48] Defendant's evidentiary submissions, Exhibit Y (Aday Oct. 31, 2000 incident report).

discrimination, as well as retaliation.[49]

November 15, 2000:    Melton counseled plaintiff "not to do queries." He explained that he had told plaintiff "not to do queries" several times in the past, and she had continued to disobey his instructions.[50]  (Unfortunately, the record does not reveal exactly what a "query" might be.)

November 16, 2000:    Melton wrote a letter to the Board on November 16, 2000, alleging that "two employees [plaintiff and Janice Rutland] are keeping up with my times and visitors times on a day-to-day basis. I take this as harassment and intimidation against me . . . . I feel that they are doing this to use against me in the future."[51]

December 13, 2000:    Co-employees Wesley Beard and Michael Smith "wrote up" plaintiff and Janice Rutland, stating that "they have been making remarks about Colbert 911, other employees and Michael Smith and [Wesley Beard]."[52]

December 14, 2000:    Lieutenant Harlan of the Sheffield Fire Department wrote a note complaining that the personnel on plaintiff's shift (presumably plaintiff and Janice Rutland) improperly dispatched them on December 11 and 14, 2000.[53]

December 17, 2000:    David Brown of Keller Ambulance Service wrote a letter to Melton, complaining  that the personnel on plaintiff's shift (presumably plaintiff and Janice Rutland) did not follow proper emergency medical dispatch protocol.[54]

December 19, 2000:    Co-worker Jerilyn Johnson filed a statement complaining that "I am personally aware that Janice Rutland is keeping notes of other employees and Mike Melton. She will tell you if asked that she keeps a notebook and presents it to her lawyer. She is very open about it. I feel I have to watch every word that I say to Janice or Deborah. This is very unnerving and causes a lot of tension and unnecessary stress on the job."[55]

---

[49] *Id.*, Exhibit Z (Janice Rutland Complaint filed Nov. 3, 2000).

[50] *Id.*, Exhibit D (Melton affidavit), at 4.

[51] *Id.*, Exhibit BB (Melton Nov. 16, 2000 letter).

[52] *Id.*, Exhibit CC (Complaint filed Dec. 13, 2000).

[53] *Id.*, Exhibit D (Melton affidavit), at 2; Exhibit DD (Harlan note).

[54] Defendant's evidentiary submissions, Exhibit D (Melton affidavit), at 2; Exhibit EE (Brown letter).

[55] *Id.*, Exhibit FF (Johnson Dec. 19, 2000 statement).

-11-

December 20, 2000:  Co-worker Mary Boddie filed a statement claiming that plaintiff once "tried" to leave work without permission, ostensibly to go home and retrieve her eyeglasses. Boddie told her that she could not leave because of the regulations, and plaintiff complied. Boddie further attested that plaintiff and Janice Rutland requested that she make photocopies of documents for them.[56]  However, during her deposition, Boddie qualified this statement by declaring that plaintiff and Janice Rutland requested photocopies "[j]ust as many times as the other employees did."[57]

December 21, 2000:  Shift supervisor Patti McAnally filed a statement complaining that, "[i]n recent months, I have witnessed a dramatic decline in employee moral [sic] which is slowly resulting in a decrease in professional job performance.  This decline is a result of the controversial job performance of 2 employees, Janice Rutland and Deborah Aday."[58]

December 22, 2000:  Co-employee Wesley Beard filed a statement complaining that plaintiff and Janice Rutland uttered numerous "slurs and snide remarks" about Melton, as well as the Colbert County Emergency Management Communications District, in general. He further stated that plaintiff's attitude was "very hateful."  Whenever Beard attempted to engage plaintiff in conversation, she replied "we're invisible."[59]

December 22, 2000:  Co-employee Michael Smith filed a statement similar to Beard's, complaining that plaintiff and Janice Rutland had made himself and

---

[56] *Id.*, Exhibit GG (Boddie Dec. 20, 2000 statement).

[57] *Id.*, Exhibit E (Boddie deposition), at 54. Boddie, an African American female, filed an EEOC charge against defendant on February 11, 2002. *Id.* at 56; Plaintiff's evidentiary submissions, Tab 6 (Boddie EEOC charge), at Exhibit 3. This fact helps to explain why much of Boddie's deposition testimony attempted to qualify the statement that she gave on December 20, 2000:

Q:   Why did you make this statement. . . ?

A:   Because Mike Melton and Lance Young had emphasized to me that something had to be done to get rid of these people, and I related that I would be objective as I possibly could.

Q:   Is everything else in this statement true?

A:   It's skewed, but I finally knew — I had to sign something. They were encouraging me. I got it as accurate as I possibly could.

Defendant's evidentiary submissions, Exhibit E (Boddie deposition), at 54-55.

[58] Defendant's evidentiary submissions, Exhibit HH (McAnally Dec. 21, 2000 statement).

[59] *Id.*, Exhibit II (Beard Dec. 22, 2000 statement).

-12-

Beard  "the subject of several slurs and snide remarks."[60]

January 4, 2001:    Plaintiff underwent surgery for a hysterectomy on some unspecified date during December of 2000, and did not return to work until January 23, 2001. Nonetheless, plaintiff managed to get "written up" once during her absence, stemming from an event that apparently occurred prior to her operation. Melton filed a written complaint with the Board on January 4, 2001, accusing plaintiff of "gross insubordination."  Melton explained that he had issued a new operating procedure on December 14, 2000, and plaintiff refused to sign it, as required by regulations.[61]  Plaintiff asserts that she did not sign the new operating procedure because she was unfamiliar with it.[62]

January 28, 2001:   Plaintiff lodged a complaint against co-worker Wesley Beard, accusing him of sleeping while on duty.  Apparently, someone photographed Beard while sleeping, and Janice Rutland showed these photographs to Melton.  Nevertheless, Beard apparently escaped punishment. Plaintiff claims that several of her fellow employees had been caught sleeping on the job, and were not reprimanded.[63]

February 3, 2001:   Co-workers Jerilyn Johnson and Wesley Beard filed an incident report stating that plaintiff had been tardy in answering a page, and when she eventually did return the page, she refused to come into work and cover a shift that had been assigned to her.[64]

February 5, 2001:   Plaintiff lodged a complaint against shift supervisor Patti McAnally, complaining that McAnally left during the middle of her shift on January 26, 2001.  Plaintiff explained that McAnally's departure required her to serve as the shift supervisor for the remainder of the shift, without any prior notice.[65]

## I.    Plaintiff's EEOC Charge

Plaintiff filed an EEOC charge on February 27, 2001, complaining that she had been

---

[60] Id., Exhibit JJ (Smith Dec. 22, 2000 statement).

[61] Id., Exhibit KK (Melton Jan. 4, 2001 complaint).

[62] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 5.

[63] Id. at 5-6.

[64] Defendant's evidentiary submissions, Exhibit LL (Incident report dated Feb. 3, 2001).

[65] Id., Exhibit MM (Incident Report dated Feb. 5, 2001).

subjected to retaliation for her support of Janice Rutland's EEOC charge.[66]  In her own charge, plaintiff complained, among other things, that co-worker Wesley Beard, a Caucasian male, was promoted to night shift supervisor "at some point" after she sent Melton her letters during September of 2000.[67]  Plaintiff claims that she had more experience than Beard and was "better qualified" to hold the position.[68]  Plaintiff had not applied for the job, however, and she also had not made any prior complaint to the Board about her nonselection for the position.[69]  (Plaintiff explains her failure to apply by asserting that the job opening was not "posted."[70])

**J.     Plaintiff's Meeting with the Board on March 1, 2001**

In response to the written complaints filed by plaintiff's co-workers, the Board issued a letter to plaintiff on February 7, 2001, directing her to appear before them at a meeting on March 1, 2001.[71]  On the date of this meeting, the Board was not aware that plaintiff had filed an EEOC charge.[72]  During the meeting, a Board member asked plaintiff why she felt that there was hostility among the employees, and she answered that she did not know why.[73]  Plaintiff also testified that she felt "singled out," but did not articulate why she felt this way when asked.[74]  At that point, the Board members asked plaintiff to try to get along with her co-workers, and took no further action.[75]

---

[66] *Id.*, Exhibit B (Aday deposition) at Exhibit 22 (Aday EEOC charge).

[67] *Id.*; Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 7.

[68] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 7.

[69] Defendant's evidentiary submissions, Exhibit B (Aday deposition), at 124.

[70] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 7.

[71] Defendant's evidentiary submissions, Exhibit PP (Board letter dated Feb. 7, 2001).

[72] *Id.*, Exhibit C (King affidavit), at 2.

[73] *Id.*

[74] *Id.*

[75] *Id.*

**K.    Plaintiff and Janice Rutland are Again Accused of Misfeasance**

Jennifer Rutland, in her capacity as a member of the Cherokee Rescue Squad, wrote another letter to Melton on March 20, 2001, accusing Janice Rutland and plaintiff of failing to follow proper procedures when dispatching emergency personnel in response to an accident involving a fatality.[76] At the Board's next regular meeting, held on April 3, 2001, several members of the Cherokee Rescue Squad attended, and complained about the manner in which Janice Rutland and plaintiff had dispatched the accident call.[77]  Based on this testimony, the Board suspended Janice Rutland and plaintiff *with pay*, and ordered them to appear before the Board on April 5, 2001.[78]

During the April 5, 2001 meeting, audio tapes of the accident dispatches were reviewed.[79] The Board then compared plaintiff's handling of the call to written procedures, and questioned plaintiff about discrepancies.[80]  Employing this process, the Board determined that there were numerous deficiencies in plaintiff's handling of the call and, consequentially, suspended her *without pay*, required her to be retrained and recertified, and placed her on probation for twelve months.[81] (The record does not reveal what disciplinary action, if any, was taken against Janice Rutland.) Plaintiff denies that she made any errors in handling the March 20, 2001 accident calls, and filed a grievance with the Board on April 12, 2001.[82]

**L.    A New Employee Handbook is Issued**

On April 2, 2001, *i.e.*, three days before the Board meeting at which plaintiff was suspended,

---

[76] *Id.*, Exhibit QQ (Jennifer Rutland letter dated March 20, 2001).

[77] Defendant's evidentiary submissions, Exhibit CC (King affidavit) at 2.

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.* at 2-3.

[82] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 8-9.

the Board promulgated a new employee handbook.[83]  One of the key changes in the handbook was that it granted the Director authority to directly discipline and terminate employees.[84]  Prior to this change, Melton could only recommend such action to the Board.[85]  Additionally, the grounds for discipline were made more specific, and leaves of absence were limited.[86]

## M.    Plaintiff's Recertification, Return to Work, and Subsequent Termination

Following her retraining and recertification, plaintiff met with Melton and two Board members on May 7, 2001, for the purpose of discussing the new employee handbook, and then returned to work.[87]  Upon her return to work, plaintiff was assigned to the night shift, under the supervision of Patti McAnally.[88]  Plaintiff took sick leave on May 8, 2001, to be examined by a physician in Birmingham, Alabama.[89]  Plaintiff then worked on May 9, 10, and 11, 2001, with May 11th being the last day that she actually worked for defendant.[90]  Plaintiff apparently was not scheduled to work on May 12 and called in sick on May 13, 2001.[91]  Plaintiff came into the office at some unspecified time thereafter and presented Melton with a letter from her physician, requesting that she be given a six-month leave of absence.[92]  Plantiff and Melton argued over the provisions of the sick leave policy, which had been revised in the new employee handbook, and Melton did not grant plaintiff her requested leave of absence.[93]  During this visit to Melton's office, plaintiff

---

[83] Defendant's evidentiary submissions, Exhibit SS (Employee handbook dated April 2, 2001).

[84] *Id.* at 15-16

[85] Defendant's brief in support of summary judgment, at 12.

[86] *Id.*; Exhibit SS (Employee handbook dated April 2, 2001).

[87] Defendant's evidentiary submissions, Exhibit D (Melton affidavit), at 6.

[88] *Id.*

[89] *Id.*

[90] *Id.* at 6-8.

[91] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 10.

[92] *Id.*

[93] *Id.*

concealed a tape player in her purse, and secretly recorded their conversation.[94]

During her final days at work, there was yet another exchange of "write-ups" between plaintiff and her supervisors.  On May 11, 2001, plaintiff was "written up" by McAnally for sleeping while on duty.[95]  (Plaintiff denied that she was sleeping at the time.[96])  She was subsequently issued an "OFFICIAL REPRIMAND NOTIFICATION" by Melton, which stated that "THIS IS YOUR LAST WARNING," and "ANY FURTHER VIOLATIONS OF THESE POLICIES WILL RESULT IN IMMEDIATE TERMINATION."[97]

On May 18, 2001, plaintiff lodged a written complaint against her new shift supervisor, Patti McAnally, accusing her of not following dispatch procedures on three occasions, and stating:

> On May 8, 2001, I also observed [McAnally] taking a white powder substance frequently on the shift and noticed that when she walked up the hall to go upstairs she clumsy [sic] held the wall for support.  Also I noticed that she kept nodding off and on and appeared to be very fidgety and agitated.[98]

When questioned, McAnally explained that she was taking "BC Headache Powder," and volunteered to undergo a drug screening.[99]  The test did not reveal any controlled substances in McAnally's urine.[100]

On May 21, 2001, Melton sent plaintiff a certified letter, informing her that she had been terminated.[101]  The letter explained that "[t]he fact that you were sleeping on the job, your continued

---

[94] Defendant's evidentiary submissions, Exhibit B (Aday deposition # 2), at 28-29.

[95] *Id.*, Exhibit TT (Incident report dated May 11, 2001).

[96] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 9.

[97] Defendant's evidentiary submissions, Exhibit D (Melton affidavit), at 6; Exhibit VV (Incident report dated May 11, 2001) (all cap emphasis in original).

[98] *Id.*, Exhibit WW (Aday letter dated May 18, 2001).

[99] *Id.*, Exhibit D (Melton affidavit), at 7-8.

[100] *Id.*, Exhibit XX (McAnally urinalysis results).

[101] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 10; defendant's evidentiary submissions, Exhibit YY (Aday termination letter dated May 21, 2001).

-17-

attitude problems, and your inability to get along with your co-employees and supervisors; [sic] falls within the parameter of [a] terminable offense.  As a result, you are hereby terminated effective immediately."[102]

## II. DISCUSSION

Plaintiff filed suit on June 12, 2001, with her sole claim alleging that defendant retaliated against her in response to her complaints of discrimination, as well as her support of Janice Rutland's complaints of discrimination, all in violation of Title VII.

### A.    Plaintiff's Protected Activities

"Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Congress thus recognized two predicates for retaliation claims:  one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174

---

[102] Defendant's evidentiary submissions, Exhibit YY (Aday termination letter dated May 21, 2001).

(11th Cir. 2000) (citations omitted).

The filing of a formal charge of discrimination with the EEOC, as plaintiff did on February 27, 2001, is a protected activity under the "participation clause." *See, e.g., Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir. 1998). The parties disagree as to whether plaintiff's letters to Melton, dated September 10 and 28, 2000, qualify as protected activities.[103]

Plaintiff's September 10 letter cryptically states that "I feel I'm being singled out and it's creating a hostile working environment for me. I feel it is directly linked to me working with Mrs. Rutland."[104] While an employee's express complaints to a supervisor about perceived discriminatory practices clearly constitute protected activity, a vague, nonspecific declaration of unfair treatment is insufficient to constitute "opposition" under Title VII. *See Cartwright v. Tacala, Inc.*, No. CIV

---

[103] The record reflects that plaintiff did not engage in any protected activity prior to September of 2000. At deposition, plaintiff admitted that she had not previously informed anyone that she supported Janice Rutland's discrimination claim:

> Q:    You hadn't mentioned [Janice Rutland's charge of discrimination] to [Melton] prior to this, had you?
>
> A:    No.
>
> Q:    And you hadn't mentioned it to anybody prior to this, had you?
>
> A:    I'm not — no, sir.  I'm not sure that I had.
>
> . . .
>
> Q:    You never told anyone that you thought that Ms. Rutland was discriminated against because of some evidence that you had, did you?
>
> . . .
>
> A:    No, sir.
>
> Q:    You just simply said you supported her; isn't that right?
>
> A:    Right.

Defendant's evidentiary submissions, Exhibit B (Aday deposition # 2), at 177-78.

[104] *Id.*, Exhibit T (Aday September 10, 2000 letter) (emphasis supplied).

-19-

A 99-W-663-N, 2000 WL 33287445, at *9-10 (M.D. Ala. Nov. 1, 2000) (citations omitted).  Here, plaintiff merely asserts that she was "singled out" because she "work[ed] with" Janice Rutland.  In the Eleventh Circuit, "[u]nfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII." *Coutu v. Martin County Board of County Commissioners,* 47 F.3d 1068, 1074 (11th Cir. 1995) (emphasis in original); *see also Taylor v. Renfro Corp.,* 84 F. Supp. 2d 1248, 1255 (M.D. Ala. 2000) (holding that "unfair treatment alone does not qualify as an unlawful employment practice under Title VII, absent evidence of discrimination based on some unlawful category").  Further, plaintiff admitted during deposition that, prior to her September 10, 2000 letter to Melton, she had not complained to him, or anyone else, about discrimination in the workplace.[105]  Thus, viewing that letter in light of the totality of circumstances, there was no basis for Melton to divine a complaint of unlawful discrimination.  *See Reynolds v. Golden Corral Corp.,* 106 F. Supp. 2d 1243, 1253-54 (M.D. Ala. 1999) ("The relevant question . . . is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.") (citation and internal quotation marks omitted); *see also Galdieri-Ambrosini v. National Realty & Development Corp.,* 136 F.3d 276, 292 (2d Cir. 1998) (holding that "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could have reasonably understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII").

Accordingly, plaintiff's September 10, 2000 letter does not constitute protected activity,

---

[105] *See supra* note 103.

because it did not adequately communicate the assertion that defendant was acting in an unlawful manner.[106] *See, e.g., Barber v. CSX Distribution Services,* 68 F.3d 694, 697, 702 (3d Cir. 1995) (holding that a plaintiff's complaint, stating that "I am quite puzzled as to why the position was awarded to a less qualified individual," was "just too vague" to be considered protected activity); *Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1312-13 (6th Cir. 1989) (holding that "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice"); *Primes v. Reno,* 999 F. Supp. 1007, 1016 (N.D. Ohio 1998) ("[P]laintiff here offered vague suggestions of racism as one possible explanation of what he perceived as a poor evaluation, but this is not sufficient to constitute 'opposition' under Title VII and cannot form the basis for a retaliation claim."); *Ramos v. City of New York,* No. 96 Civ. 3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997) (holding that plaintiff's complaint was too vague when she merely described unfair treatment, but never alleged discrimination was based on some protected status).

In contrast, plaintiff's September 28, 2000 letter unambiguously stated "I support Janice Rutland in her claim, that she was denied the position of Colbert County E9-1-1 [sic] Director because of her race and sex in deprivation of rights secure [sic] to her under Federal Law."[107] Such "support" is protected by the opposition clause of 42 U.S.C. § 2000e-3(a). *See, e.g., Abramson v. William Paterson College of New Jersey,* 260 F.3d 265, 288 (3d Cir. 2001) (explaining that activities protected by the opposition clause include "informal protests of discriminatory employment practices . . . [such as] expressing support of co-workers who have filed formal charges") (quoting

---

[106] Plaintiff's use of the phrase "hostile working environment" in her September 10, 2000 letter is not dispositive, largely because there is no indication that Melton had any legal training, such that he should have associated the invocation of this term with a complaint of discrimination or harassment.

[107] *Id.,* Exhibit V (Aday September 28, 2000 letter).

*Sumner v. U. S. Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990)); *Lyman v. Nabil's, Inc.*, 903 F. Supp. 1443, 1448 (D. Kan. 1995) (plaintiff engaged in protected activity by expressing support for co-workers who were subjected to supervisors' sexual advances).

A plaintiff generally must prove three elements to establish a prima facie case of retaliation: (1) she engaged in statutorily protected expression;[108] (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

In addition to these elements, when a retaliation claim is based upon conduct falling under Title VII's opposition clause the plaintiff also must demonstrate a good faith, reasonable basis for believing that the allegedly discriminatory practices she opposed constituted a violation of Title VII, as distinguished from proving that the employer actually engaged in an unlawful employment practice. *See, e.g., Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir. 2001); *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998). This additional element of a prima facie case for a retaliation claim under the opposition clause has two constituent parts — a subjective and an objective component — as the Eleventh Circuit observed

---

[108] "Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment." *Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Rollins v. Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).

in *Little v. United Technologies*:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and records presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.
>
> A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances." *Sias v. City Demonstration Agency,* 588 F.2d 692, 695 (9th Cir. 1978). *See also Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a prima facie case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), *cert. denied,* 455 U.S. 1000, 102 S. Ct. 1630, 71 L. Ed. 2d 866 (1982).

*Little,* 103 F.3d at 960 (emphasis in original) (footnote omitted); *see also, e.g., Harper,* 139 F.3d at 1388; *Meeks,* 15 F.3d at 1021; *EEOC v. White & Sons Enterprises,* 881 F.2d 1006, 1012 n.5 (11th Cir. 1989); *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir. 1989); *Silver v. KCA, Inc.,* 586 F.2d 138 (9th Cir. 1978); I Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 656-57 (3d ed. 1996) ("The rationale is that appropriate opposition should not be chilled by fear of retaliation — even if, as a matter of fact or law, there is no violation.") (footnote omitted).

Further, "the objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against the existing law." *Clover v. Total Systems Services, Inc.,* 176 F.3d 1346, 1351 (11th Cir. 1999); *see also, e.g., Lipphardt,* 267 F.3d at 1187 ("The belief must also be measured against substantive law at the time of the offense.") (citing

*Clover*).  Here, plaintiff opposed the selection of Mike Melton, a Caucasian male, for the

directorship of defendant, over Janice Rutland, an African American female.  Such a selection, if

found to be based upon race, would be violative of Title VII.  Thus, measured against Eleventh

Circuit precedent, plaintiff's opposition to that Melton's selection is objectively reasonable.  Further,

the court finds, for the purposes of summary judgment, that plaintiff had a good faith belief that

Melton was selected over Rutland because of racial considerations.  Thus, plaintiff's letter dated

September 28, 2000, opposing such a selection, is a statutorily-protected activity.[109]

## B.    Direct Evidence Analysis of Plaintiff's Claim

"A Title VII retaliation claim can be proved by either direct or circumstantial evidence."

*Kent v. City of Homestead,* No. 00-3601-CIV, 2002 WL 732109, at *8 (S.D. Fla. March 14, 2002);

(citing, *e.g., Merritt v. Dillard Paper Co.*, 120 F.3d 1181 (11th Cir. 1997)).  In *Merritt*, the Eleventh

Circuit held that a statement made by the president of a corporate employer to the plaintiff prior to

firing him, concerning deposition testimony given by the plaintiff in support of a female co-

employee's sexual harassment claim — *i.e.*, "[y]our deposition was the most damaging to Dillard's

case, and you no longer have a place here at Dillard Paper Company" — was direct evidence of a

retaliatory motive: "The statement made in the present case is the equivalent of 'Fire Merritt — he

gave the most damning deposition testimony.'"  *Merritt*, 120 F.3d at 1190; *see also Earley v.

Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (holding, in the context of an

ADEA claim, that the quintessential example of direct evidence would be "a management

---

[109] Further, an attorney who formerly represented plaintiff sent defendant and Melton a letter, via hand delivery, on October 5, 2000, informing them that he represented plaintiff "in potential civil rights claims that she may assert against [defendant] as a result of deprivation of rights secured to her under . . . Title VII.  Her Title VII claims arise out of retaliatory conduct directed towards her as a result of her supporting a co-worker who has asserted a Title VII claim."  The letter also threatened to seek attorney's fees, should plaintiff's claim be vindicated in any part.  Defendant's evidentiary submissions, Exhibit B (Aday deposition # 2), at defendant's exhibit #32 (Padgett October 5, 2000 letter).

memorandum saying, 'Fire Earley — he is too old.'"). The Eleventh Circuit has held: "Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996); *see also Merritt*, 120 F.3d at 1189 (same).

Plaintiff claims that she can establish her retaliation claim *via* both methods of proof. Plaintiff asserts that there is direct evidence of defendant's retaliatory intent, in the form of statements made by Melton in the presence of his administrative assistant, Mary Boddie. (Coincidentally, Boddie also filed a charge of discrimination against defendant.[110])

Although Boddie, who worked for defendant from June 30, 2000 until August 29, 2001,[111] could not recall the specific dates on which Melton uttered the statements alleged to be direct evidence of his discriminatory animus, she explained that his comments were "continuous" — "[i]t was a[n] ongoing [conversation] during the work week."[112]  At deposition, Boddie testified as follows:

> Q:   And you say that he [Melton] told you he was unhappy with them.  What did he say?

---

[110] Plaintiff's evidentiary submissions, Tab 6 (Boddie EEOC charge), at Exhibit 3.

[111] *Id.*

[112] Defendant's evidentiary submissions, Exhibit E (Boddie deposition), at 34-35.  Apparently, many of Melton's comments were made before December 20, 2000, which was the date that Boddie signed a statement as to her dealings with plaintiff and Janice Rutland, as evidenced from the circumstances that caused Boddie to give that statement:

> Q:   Why did you make this statement . . . ?

> A:   Because Mike Melton and Lance Young had emphasized to me that something had to be done to get rid of these people [presumably plaintiff and Janice Rutland] . . . .

*Id.* at 54-55.

A:     He wanted them gone.

Q:     And when he said he wanted them gone what did he say to you about [why] he wanted them gone?

A:     That he had been captain of his baseball team at Cherokee or somewhere in high school, and as captain, he ruled. Everything went his way, and he was going to take the helm of that directorship. And it was going to be done his way. You were going to be on his team, or you were going to be out the door. They were not on his team.

Q:     Other than their not being on his team, did he say anything else about why he wanted them gone?

A:     They were repulsive. He didn't like — he didn't like them. I mean they weren't packaged the way he wanted them packaged. He wanted his team the way he wanted it to look.[113]

. . . .

A:     . . . And if you crossed him . . . he pulled out all of the stops.[114]

. . . .

Q:     Other than saying "got to be on my team," did he say anything else that you thought was inappropriate?

A:     Yes, many things. I mean he slammed doors.[115]

. . . .

A:     He consciously put pressure on me to realize that I had been brought in — that he had first interviewed me and sought me in order for me to come in and be on his team, and that I needed to get in line with that, that everybody else was supportive of him. He named Patty [presumably referring to Patti McAnally]. He named Wesley Beard. He named Jennifer Rutland. He said, "You support me, or you hit the door." . . .[116]

. . . .

---

[113] Defendant's evidentiary submissions, Exhibit E (Boddie deposition), at 18-19.

[114] *Id.* at 19-20.

[115] *Id.* at 22.

[116] *Id.* at 23-24.

Q:      My simple question is: I want to know everything that Mr. Melton said that you considered to be inappropriate with regard to Ms. Rutland or Ms. Aday?

A:      He discussed their size. He discussed their looks. He discussed them getting on his nerves. He discussed that they were causing him to not be able to function or work, that things would be better if they were gone. . . .[117]

. . . .

A:      He [Melton] called them whining bitches. He would call them fat bitches, disgusting, they smelled.[118]

. . . .

Q:      Now, you told me that Mr. Melton referred to Ms. Aday and Ms. Rutland as whining bitches. On how many occasions did you hear that?

A:      Maybe a few. I mean —

Q:      Two, three times?

A:      From June 30th until — I can't say.[119]

. . . .

Q:      What did he say about their looks, though?

A:      They were not what he wanted on — in his environment.

Q:      Other than saying he didn't want their looks in his environment, did he say anything else about their looks?

A:      Yes.

Q:      What?

A:      I mean he wanted them gone. He didn't care for their looks.[120]

. . . .

---

[117] *Id.* at 25.

[118] *Id.* at 26.

[119] *Id.* at 33.

[120] Defendant's evidentiary submissions, Exhibit E (Boddie deposition), at 36.

-27-

Q:      Now, you said he strategized about having them gone.  What did you hear
        Mr. Melton say that was strategizing about getting rid of Ms. Rutland and
        Ms. Aday?

A:      They were to be watched.  There were to be notes taken.  He encouraged me
        to write things up on them on a continuous basis.  Lance Young did.  David
        Reed did.[121]

. . . .

Q:      . . . Did he [Melton] do anything else that you claim fall [sic] into this
        category of strategizing to get rid of them?

A:      He encouraged Wesley Beard and Michael David Smith to watch them on
        and off the job.  He called Michael David Smith and Wesley in at one point
        and when one of the board members, Mr. Mark Simpson, was there and
        questioned Michael David as to what he saw when he had him to drive by
        Ms. Aday's house.  He questioned me as to monies that I had issued to them
        for travel expenses.[122]

. . . .

Q:      When did you learn that the two employees [presumably plaintiff and Janice
        Rutland] were engaged in charges of discrimination?[123]

. . . .

A:      I was told by Mr. Melton, I believe, in October [presumably, October of
        2000].

Q:      What did he tell you?

A:      He told me that they had gone to the commission on him.  He told me that
        they were out to get him, that he had done nothing wrong, that he needed my
        support, and he needed my help.

Q:      Now, he told you who had gone to the commission on him?

A:      He told me that Janice Rutland and Deborah Aday had.

---

[121] *Id.* at 38.

[122] *Id.* at 40.

[123] *Id.* at 57.

Q:      And what commission had they gone to?

A:      Colbert County.[124]

. . . .

Q:      *Well, did he say anything negative about the fact that they had filed a lawsuit*
        *against the company?*

A:      *Yes.*

Q:      *What did he say?*

A:      *That he was going to get them, that he was going to have to defend himself,*
        *and that he was going to have to take care of it.*[125]

Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (the term "direct evidence," when used in the context of a Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require ... an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption").

Further, "[f]or statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." *Trotter v. Board of Trustees of the University of Alabama,* 91 F.3d 1449, 1453-54 (11th Cir. 1996) (citation

---

[124] *Id.* at 57-58.

[125] Defendant's evidentiary submissions, Exhibit E (Boddie deposition), at 61 (emphasis supplied).

omitted).

Melton's statements that he was "going to get [plaintiff]," and that he was "going to have to take care of it," clearly evince an intent to retaliate against plaintiff in response to her support of Janice Rutland's discrimination claim, if not plaintiff's own EEOC charge. Construing the facts and drawing all reasonable inferences in favor of plaintiff, this court finds that plaintiff has presented direct evidence of a retaliatory animus on the part of Melton, who made the decision to terminate her employment.

> "When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available." *Trotter v. Board of Trustees of University of Alabama*, 91 F.3d 1449, 1453 (11th Cir.1996); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir.), *cert. denied*, 467 U.S. 1204, 104 S. Ct. 2385, 81 L. Ed. 2d 344 (1984). The basis for the analysis is that once a plaintiff produces direct evidence of a discriminatory motive, and the trier of facts accepts this testimony "the ultimate issue of discrimination is proved." *Bell*, 715 F.2d at 1556. As such, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989).

*Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 961-62 (11th Cir.1997).

## C.   Narrowing of Issues for Trial

### 1.   Adverse employment actions

One of the chief functions of summary judgment is to narrow the issues which may be addressed at trial. While plaintiff has produced direct evidence of Melton's retaliatory intent, several of the incidents that she complains of cannot be reasonably cast as "adverse employment actions." In the brief she submitted in opposition to summary judgment, plaintiff argues that the following actions and incidents constitute adverse employment actions:

-30-

(1)    "In October 2000, [plaintiff] was brought before the board to discuss a complaint which had been made by an outside agency."

(2)    "In November 2000, Melton filed a complaint against [plaintiff] with the Board."

(3)    "In December 2000, numerous co-employees wrote statements against [plaintiff], many at the request of Melton."

(4)    "In January 2001, the plaintiff was called at home by a supervisor, [Patti] McAnally, and harassed because she had not yet returned to work from her medical leave."

(5)    "Also in January 2001, Melton wrote a complaint about the plaintiff because she did not sign [off on a new procedure that Melton had instituted] in December [of 2000]."

(6)    "In February 2001, the plaintiff received a letter from the [Board] requiring her to attend a meeting concerning the statements the plaintiff's co-employees had made against her in December.  In March 2001, the plaintiff attended the Board meeting concerning these complaints."

(7)    "Also in March 2001, the plaintiff received a complaint from an outside agency concerning her handling of a call.  The Board held a hearing on this matter in April 2001, and suspended the plaintiff without pay until May 2001.  The Board also required the plaintiff to be retrained and [re-certified] as a dispatcher."

(8)    "In May 2001, when the plaintiff came back to work, she was written-up by her new supervisor, Patti McAnally.  A few days later she was written up by McAnally again for sleeping on the job."

(9)    "Finally, Melton terminated the plaintiff on May 21, 2001."

(10)   "[Plaintiff was] left out of employee meetings and dissemination of information."

(11)   "The plaintiff also claims that she lost out on a promotion to a member of [what plaintiff cryptically refers to as] 'Melton's team.'"

(12)   Plaintiff "was paid less than another employee because of retaliation."

(13)   "Melton would not answer any of [plaintiff's] questions about new procedures and would fly into a rage when [she] asked the questions."[126]

"An employment action is considered 'adverse' only if it results in some tangible, negative

---

[126] Plaintiff's brief opposing summary judgment, at 30-31.

effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (addressing an ADA retaliation claim); *see also, e.g., Gupta*, 212 F.3d at 587 (holding, in the context of a Title VII retaliation claim, that "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998) (holding, in the context of a Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.")

"Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality ... to be cognizable under the anti-retaliation clause'" of Title VII. *Gupta*, 212 F.3d at 587 (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)).

In other words, a plaintiff "must show a serious and material change" in the terms, conditions, or privileges of the job before an employment action can be described as "adverse." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). An employment action does not become "adverse" simply because an employee dislikes it, or disagrees with it. *See, e.g., Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action."). That is because "Title VII[] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (citation omitted). Neither "every unkind

act,"[127] nor "everything that makes an employee unhappy,"[128] amounts to an *adverse* employment action. "Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (Posner, C.J.) (*quoted with approval in Doe*, 145 F.3d at 1449).

On the other hand, "conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute an adverse action under Title VII." *Bass*, 256 F.3d at 1118 (citing *Graham v. State Farm Mutual Insurance Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Robinson*, 120 F.3d at 1300).

The question of whether an employee has suffered an employment action that is sufficiently material to be actionable normally must be determined on a case-by-case basis, *see Bass*, 256 F.3d at 1118, *Gupta*, 212 F.3d at 587, using both a subjective and an objective standard. *See, e.g., Hinson v. Clinch County*, 231 F.3d 821, 829 (11th Cir. 2000) (quoting *Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998) (recognizing that the subjective requirement is almost always satisfied, and imposing an objective requirement)).

Applying these criteria to the incidents listed at the beginning of this section, the court begins by noting that plaintiff's suspension without pay and subsequent termination clearly were "adverse" employment actions. The remainder of her laundry list requires closer scrutiny.

The fact that plaintiff was summoned before the board to respond to complaints that had been filed against her, as well as her complaint of being called at home by her supervisor *on one occasion*, cannot be reasonably cast as causing "a serious and material change" in the terms, conditions, or

---

[127] *Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting *Wu v. Thomas*, 996 F.2d 271, 273 n.3 (11th Cir. 1993) (*per curiam*)).

[128] *Doe*, 145 F.3d at 1450 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)); *see also Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action.").

privileges of her employment. *See Davis,* 245 F.3d at 1239. At most, these incidents were *de minimis* inconveniences and, as such, do not rise to a level of substantiality sufficient to constitute adverse employment actions. *See Doe,* 145 F.3d at 1453.

Several of the actions and incidents that plaintiff has listed involve complaints and negative statements filed against her by Melton, her supervisor, and her co-employees. The relevant issue, however, is whether the "write-ups" can be properly construed as adverse employment actions. This court holds that they cannot, because none had any detectable effect on the terms, conditions, or privileges of plaintiff's employment. A mere rebuke or admonishment alone is not sufficient to rise to the level of an adverse employment action. "Although adverse employment actions may include reprimands . . . the action in question must have more than a tangential effect on the ultimate employment decision . . . . Indeed, the conduct in question must rise to a substantial level before it can be cognizable as unlawful discrimination." *Hanley v. Sports Authority*, 143 F. Supp. 2d 1351, 1356 (S.D. Fla. 2000) (discussing a race discrimination claim) (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998); *Mattern v. Eastman Kodak,* 104 F.3d 702, 708 (5th Cir. 1997); *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994)); *see also, e.g., Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (holding that unfair reprimands or negative performance evaluations of employee, unaccompanied by some tangible job consequence, do not constitute adverse employment actions); *Oest v. Illinois Department of Corrections,* 240 F.3d 605, 613 (7th Cir. 2001) (holding that, even though "each oral or written reprimand brought [plaintiff] closer to termination," they still did not form an independent basis for liability under Title VII because, "absent some tangible job consequence accompanying the reprimands, we decline to broaden the definition of adverse employment action to include them") (internal quotation marks

and citation omitted). Here, plaintiff has not pointed to any tangible consequence related to the "write-ups" filed against her, apart from those connected to her suspension and termination; and, thus, they cannot reasonably be construed as adverse employment actions, regardless of whether they are considered individually or collectively.

Two of plaintiff's claimed "adverse" employment actions are stated in a hopelessly vague form, which gives the court little insight into their substance, much less whether they rose to a level of substantiality sufficient to alter the terms, conditions, or privileges of plaintiff's employment. Her complaints over being excluded from meetings and the routine dissemination of information, and, Melton's failure to answer her questions without "fly[ing] into a rage," have not been demonstrated to be adverse employment actions. Transcripts of tape recordings that plaintiff surreptitiously made of some of her conversations with Melton demonstrate that he *did not* "fly into a rage" at any point.[129] Further, "some courts have held that personality conflicts at work that generate antipathy and make an employee's position more difficult, as well as 'snubbing' by supervisors and co-workers, do not constitute retaliation cognizable under § 704(a)." 1 B. Lindemann & P. Grossman, *Employment Discrimination Law* 669 (3d ed. 1996) (footnote omitted).

This court cannot discern what plaintiff means by the assertion that she "lost out on a promotion to be a member of 'Melton's team.'"[130] Assuming that she refers to the fact that a Caucasian male co-worker, Wesley Beard, was promoted to night shift supervisor in January of 2001, the court first observes that plaintiff did not apply for the position, an omission which plaintiff explains by stating that the position was not posted.[131] Even so, plaintiff provides no evidence,

---

[129] Defendant's evidentiary submissions, Exhibit B (Aday deposition # 2), at defendant's exhibit #6.

[130] Plaintiff's brief opposing summary judgment, at 31

[131] Defendant's evidentiary submissions, Tab 2 (Aday deposition # 2), at 124.

beyond her own generalized assertions, to support her claim that she should have been promoted, instead of Beard. She does not submit a list of the requirements for promotion to night supervisor, much less how she met those qualifications. Discovery was commenced in this action long ago, and plaintiff has a duty to present *admissible evidence* at the summary judgment stage. She has given the court nothing of substance to analyze here, much less a showing of how Beard's promotion affected the terms, conditions, or privileges of plaintiff's employment. While it is true that the *denial* of a promotion is generally considered to be a adverse employment action, *see, e.g., Pennington v. City of Huntsville,* 261 F.3d 1262, 1267 (11th Cir. 2001) (citation omitted), plaintiff admits that she never applied for this position. Hence, there was no adverse employment action, because there was no consideration of plaintiff for the position, much less a denial. Note that if plaintiff has a genuine claim that defendant wrongfully withheld information about the availability of the night shift supervisor position, the burden is on her to set forth evidence and argument supporting her contention.

Finally, plaintiff claims that an employee hired in January of 2001 was paid a higher hourly wage. Her declaration states:

> I have knowledge that a male dispatcher, Chris Creasy, made more money per hour than I did even though he had been employed since January 2001, and I had been employed since December 1998. I feel that this pay disparity is in retaliation against me for my support of Ms. Rutland's claims of discrimination.[132]

Plaintiff provides no further evidence to support this contention. Plaintiff has not provided proof of Creasy's race, duties, shift, pay scale, or any other factual basis for the "knowledge" that plaintiff claims to have pertaining to this matter. If plaintiff desired to assert a disparate pay claim, she should have done so with appropriate pleadings, evidence, and argument.

---

[132] Plaintiff's evidentiary submissions, Tab 1 (Aday declaration), at 7-8.

-36-

Accordingly, plaintiff has established two events that could form the basis of a retaliation claim — her suspension without pay on April 5, 2001, and her termination on May 21, 2001. The question that next presents itself is whether plaintiff's direct evidence can be used to show that defendant engaged in these two adverse employment actions for a retaliatory purpose.

### 2.    Applicability of plaintiff's direct evidence

Summary judgment is due to be denied as to that portion of plaintiff's retaliation claim based upon her termination, because a reasonable factfinder could infer that Melton acted under the grip of a retaliatory animus when he fired her.

Plaintiff's direct evidence is not applicable to that portion of her retaliation claim arising from her suspension, retraining, and recertification, however.

The record reflects that plaintiff was suspended without pay and required to undergo retraining after a Board investigation determined that she had committed numerous errors in the handling of emergency calls and dispatches. This investigation was triggered by a written complaint lodged with Melton by his cousin, Jennifer Rutland.[133] However, there is no evidence that Melton participated in the Board's investigation or decision, nor that Melton's influence tainted the decision-making process. Absent evidence of Melton's involvement in the decision-making process, there can be no finding of a causal linkage between his discriminatory animus and the suspension, retraining, and recertification requirements imposed upon plaintiff by the Board. *See, e.g., Trotter v. Board of Trustees of University of Alabama,* 91 F.3d 1449, 1453-54 (11th Cir. 1996) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision.") (citation omitted).

---

[133] Defendant's evidentiary submissions, Exhibit QQ, (Jennifer Rutland March 20, 2001 letter).

More specifically, liability cannot be imposed upon the Colbert County Emergency Management Communications District unless plaintiff demonstrates that *all* members of the District's Board who voted to suspend her without pay until such time as she completed a retraining curriculum and had been recertified shared Melton's illegal retaliatory motive. *Cf. Mason v. Village of El Portal*, 240 F.3d 1337, 1339 (11th Cir. 2001) ("[T]he critical issue on appeal is whether the alleged racially discriminatory motive of only one member of a three-member majority of a five-member council can give rise to municipal liability. We agree with the trial court that it does not.") (citing *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994)); *see also Mason*, 240 F.3d at 1440 ("[T]here can be no municipal liability unless all three members of the council who voted against reappointing Plaintiff shared the illegal motive."). Plaintiff has presented no such evidence.

When the biased employee of a defendant who allegedly manifested an illegal animus toward the plaintiff (*i.e.*, Melton) and the decisionmaker ultimately inflicting the employment action complained of (*i.e.*, the District's Board) are not — as here, in the instance of plaintiff's suspension without pay — one and the same, plaintiffs sometimes attempt to supply the missing link in the causal chain through use of the so-called "cat's paw" theory.

> This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus.

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (citing *Llampallas v. Mini-Circuits, lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998)). This theoretical concept is most easily grasped in the context of sexual harassment cases.

Several courts have held that when the harasser in a Title VII case is not the decisionmaker, if the plaintiff shows that the harasser employed the decisionmaker

-38-

as her "cat's paw" — *i.e.*, the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation, *see Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) — causation is established. *See, e.g., Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996) ("If . . . [the decisionmaker] did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendations of [those who held a discriminatory animus], the causal link between [the plaintiffs'] protected activities and their subsequent termination, would remain intact."). In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers. *See Shager*, 913 F.2d at 405 (stating that in such a situation "[t]he [decisionmaker] would no more be a nonconductor [for discriminatory animus] . . . than would be the secretary who typed [the plaintiff's] discharge papers knowing nothing of the [] discrimination that lay behind the discharge"); *Burlington Indus.*, [524] U.S. [742], 118 S. Ct. at 2269. In effect, the harasser *is* the decisionmaker, and the titular "decisionmaker" is a mere conduit for the harasser's discriminatory animus.

*Llampallas*, 163 F.3d at 1249 (emphasis in original) (holding that the defendant's ultimate decisionmaker did not act as the harasser's "cat's paw," because he met with the plaintiff to investigate the situation leading to harasser's complaints).

The "cat's paw" theory has been employed in contexts other than sexual harassment cases, however. For example, the plaintiff in *Stimpson* was a former city police officer who complained that she had been wrongfully terminated because of her sex. The Chief of Police recommended that the plaintiff be discharged and, following a hearing, the municipal Civil Service Board approved the recommendation. The Eleventh Circuit held on the basis of such facts that the causal linkage between any gender-based animus motivating the Chief's recommendation and the plaintiff's subsequent termination was "broken by the Board's hearing and independent decision to actually terminate her." *Stimpson*, 186 F.3d at 1331.

We note at the outset that under Alabama law, the City has no power to terminate police officers such as Stimpson. Under Act No. 249 of the Alabama legislature, 1947 Ala. Acts 174, only the Civil Service Board has the power to do so. The Board has the discretion to terminate, give a lesser form of punishment to, or entirely vindicate a police officer brought before it. Consequently, the City's

-39-

recommendation that the Board terminate Stimpson does not, itself, constitute a change in the terms or conditions of employment absent a sufficient causal link between the termination and the discriminatory animus behind the recommendation.

We have previously stated the general proposition that in some cases, a discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge. *Zaklama v. Mt. Sinai Medical Center*, 842 F.2d 291, 294 (11th Cir. 1988). However, as we have recently explained, this causation must be truly direct. *When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity.* Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee. *Llampallas*, 163 F.3d at 1248.

One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the "cat's paw" theory. This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus. *Id.* at 1249.

In this case, Stimpson has not introduced any evidence that could reasonably indicate that the City's alleged discriminatory animus influenced the Board's decision to terminate her. Furthermore, she has not introduced any evidence to show that the Board acted as a "cat's paw" or rubber stamp for the City's recommendation. To the contrary, the evidence shows that the Board has the sole power and discretion to terminate police officers, that its members are appointed by the Governor of Alabama, that it conducted a three day hearing to investigate the charges, and that during the hearing Stimpson was represented by legal counsel and was allowed to pur on defense evidence and witnesses. It is hard to imagine any other procedural device that would ensure a more fair and independent decision than that of the Civil Service Board. We need not announce a bright line at which an independent investigation becomes a rubber stamp to resolve this case, because the record before us does not contain any hint of a cat's paw arrangement. Consequently, we hold that Stimpson has failed to produce sufficient evidence to allow a reasonable jury to find causation between the City's alleged discriminatory animus and the Board's decision to terminate her. . . .

*Stimpson*, 186 F.3d at 1331-32 (footnote omitted) (emphasis added). Again, plaintiff has presented

no evidence of a "cat's paw arrangement" between Melton and the District's Board. Consequently, she cannot benefit from the direct evidence of Melton's retaliatory animus when considering the Board's independent action.

An analogous case, although arising under a different corpus of civil rights law, is *Morro v. City of Birmingham*, 117 F.3d 508 (11th Cir. 1997). The claims in *Morro* were based upon 42 U.S.C. § 1983, and the central issue on appeal was whether "the City of Birmingham's Police Chief is a final policymaker with respect to disciplinary suspension decisions in the City's police department." *Id*. at 510.[134] The *Morro* Court found a factual situation similar to that in *Stimpson*: *i.e.*,

> the Chief's disciplinary decisions regarding dismissal, demotion, or suspension are subject to review by the Jefferson County Personnel Board, with limited further review by the Circuit Court. In fact, the Personnel Board reviewed and reversed the Chief's decision in this case, which demonstrates that the Personnel Board is not merely a rubber stamp for the Chief.
>
> Based on the City's governing regulations and evidence of its actual practices, it seems that local law makes the Jefferson County Personnel Board, and not the police chief, the final policymaker with respect to police dismissals, demotions, or suspensions. . . .

*Id*. at 514-15.[135]

### III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is due to be granted

---

[134] In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) (plurality opinion), a plurality of the Supreme Court held that "appointing authorities" who have authority to initiate personnel decisions are not municipal policymakers if those decisions are subject to meaningful administrative review. *See* 485 U.S. at 129-30, 108 S. Ct. at 927-28. Since *Praprotnik*, the Eleventh Circuit has "consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997) (collecting cases).

[135] The findings quoted in text technically are *dicta*, because the City of Birmingham failed to preserve the *Monell* defense at the trial court level; even so, "[i]f the City had preserved that issue for trial in the district court, and thus for our review on appeal, we have little doubt that the City would be entitled to escape the judgment against it on that basis." *Morro*, 117 F.3d at 515.

in part and denied in part. Unless resolved by mediation, this case shall proceed to trial on plaintiff's claim that her employment with defendant was terminated in retaliation for protected conduct. An appropriate order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this __12th__ day of December, 2002.

United States District Judge